12675, 12676. MANLEY *v.* UNDERWOOD; and *vice versa.*

12677, 12678. STRICKLAND COMPANY *v.* UNDER-
WOOD; and *vice versa.*

12679. MANLEY *v.* UNDERWOOD.

1. Where an executory contract for the sale of land is cancelled by mutu-
al consent when the first installment of the purchase-price becomes
due, the relationship of vendor and vendee ceases to exist, and the re-
lationship may become that of landlord and tenant, in which event
the owner of the land would have a lien upon crops grown upon it,
both for rent and for supplies furnished by him necessary to make
the crop.

2. "Where an owner of land contracts with another to sell it at a stip-
ulated price, to be divided into installments becoming due at specified
times, and further stipulates that in the event the installments are
not paid when due, the owner shall be paid a specified sum as rental,
the legal effect of the contract is to create the relation of landlord and
tenant between the parties, with an option to the tenant to purchase
the land upon the terms and conditions set forth in the contract."

3. Restitution has no application to rescission of contracts by mutual
consent.

4. In the present case the evidence was sufficient to show that the execu-
tory contract of sale had been mutually rescinded and a contract of
landlord and tenant substituted therefor between the vendor and the
vendee. The landlord would then have a lien for rent and a lien for
supplies furnished by him to the tenant to make a crop.

5. The vendor and the vendee in an executory contract of sale cannot by
a new and distinct contract of rescission convert their relationship in-
to that of landlord and tenant so as to affect the intervening right
of a third person. But this intervening right must be that of an in-
nocent third person without notice when entering into his contract
that the original executory contract of sale has been rescinded and
the relation of landlord and tenant created.

DECIDED DECEMBER 14, 1921.

Distraint, etc.; from city court of Greenville — Judge Hood
presiding. June 11, 1921.

The questions in this case arose on a rule against the sheriff for
the distribution of a fund which he held, arising from the sale of
certain personal property, to which fund there were several claim-
ants, who were made parties to the rule. Consent was made that all
questions raised by the parties be decided on the hearing of the
rule. The claims to the funds in the hands of the sheriff, and
the grounds of each claim, may be stated as follows: F. K. Un-
derwood sued out a distress warrant against J. M. Manley, for rent
of certain lands. Manley made a counter-affidavit setting up that

the rent was not due, and further that he was a purchaser of the lands from Underwood and occupied and held them as a purchaser and not as a tenant. Underwood at the same time foreclosed a landlord's lien for certain fertilizer supplies which he had furnished to Manley as landlord, in which foreclosure proceeding it was alleged that the defendant was seeking to remove and removing the crops on which he claimed a lien. Manley filed a counter-affidavit to the foreclosure proceeding, upon the same grounds as in the distress warrant proceeding. The R. F. Strickland Company foreclosed a crop mortgage against J. M. Manley for supplies furnished him in making the crops, and placed the mortgage fi. fa. in the hands of the sheriff. A. R. Manley claimed a special laborer's lien against J. M. Manley on the crops raised by him.

The evidence relating to each separate claim, substantially stated, was as follows: Underwood was the owner of a farm in Meriwether County, containing 185 acres of land, and he controlled two other farms in the same county, one known as the Mrs. Underwood farm and the other as the Strozier farm. These farms he rented to J. M. Manley prior to the year 1920. On August 28, 1919. Underwood sold to J. M. Manley the Underwood farm, and executed a bond for title to him, describing in detail the notes given by Manley for the purchase-money. The first installment, represented by one of the purchase-money notes, matured on December 1, 1919, and Manley failed to pay it. In March, 1920, Underwood told Manley that as he had defaulted in payment of the first installment on the land, he (Underwood) had decided to cancel the executory contract of sale evidenced by the bond for title. Underwood testified that Manley agreed that the bond for title should be cancelled, and that thereupon he (Underwood) cancelled it, writing across it, in Manley's presence, "Void for the lack of payment." Manley denied that he had agreed to this cancellation or that the cancellation took place, and stated that he could not read or write, and that no cancellation was read to him. The cancellation as claimed by Underwood changed the relationship which had up to that time existed between him and Manley, as vendor and vendee, to that of landlord and tenant. Afterwards, according to Underwood's testimony, he furnished, through the Zebulon Gin & Fertilizer Company, fertilizers of the value of $3,019.45, which were used by Manley in making the

crops for the year 1920 on the farms in question. A note signed by Manley and Underwood was given to the fertilizer company for the fertilizers. Underwood testified that he signed the note as the original purchaser of the guano, and not as Manley's security, and the fertilizer company corroborated this statement by testimony that the credit was extended to Underwood, and by Underwood's instructions the fertilizers were shipped to Manley. Manley, on the contrary, testified that he bought the guano himself as purchaser, and was the owner of the place on which it was to be used, and that, on account of the demands of the fertilizer company that he furnish security for the same, he furnished Underwood as his security. According to Underwood's testimony, on or about May 20, 1920, at the urgent request of Manley for a chance to pay for the land, a new contract was made between them which in effect extended the time of payment for the land and provided that if payment should not be made in accordance with the agreement, the relationship of landlord and tenant should continue to exist between Underwood and Manley. On or about September 1, 1920, Manley told Underwood that he could not pay for the land and would pay rent. After the crops matured and while they were being gathered, and after Underwood had made repeated visits to the farm to collect the rent and to collect for the fertilizer that he had furnished Manley, he discovered that Manley had removed and sold two bales of cotton off the rented farms, and thereupon, on October 17, he foreclosed his landlord's liens for rent and for fertilizers supplied. This execution was levied upon the crops or what remained of them. Manley's evidence was in direct conflict with that of Underwood as to the foregoing facts. He insisted that he had made no such agreement and had not removed any of the cotton from the farms, but he insisted that he had a right to do so, as he held the land as a purchaser under an executory contract, and did not hold the land at that time as tenant, and that therefore Underwood was not entitled to any of the proceeds arising from the sale of the crops which had been raised on the farms.

The R. F. Strickland Company, as a basis for its claim for the proceeds arising from the crops, introduced mortgages on the crops of the three Underwood places. These mortgages had been foreclosed and the execution placed in the hands of the sheriff.

In support of their claim J. M. Manley and George Strickland, president of the company, testified that on the first day of January, 1920, Manley went to the place of business of the Strickland Company and exhibited to George Strickland, the president of the company, the bond for title which he held from Underwood. According to the testimony of Underwood, Manley at the same time informed Strickland that he had defaulted in the first payment on the land and tried to get Strickland to lend him the money with which to meet this payment, and Strickland refused. In his testimony George Strickland said: " I knew that he (Manley) had defaulted in his first payment on the land. He told me so, and wanted me to let him have the money to pay this installment, but it was not convenient for me to do so. . . . read the bond for title saying that the same should be void for any nonpayment, when I ageed to furnish him (Manley), and Manley told me that he had defaulted in the first payment and tried to get me let him have the money for the first installment. I refused because I did not think the land was worth the price he had agreed to pay, and I did not think Manley had any equity in the land." In support of its claim the Strickland Company submitted testimony showing that it had no notice of the changed relationship between J. M. Manley and Underwood, but was induced by Manley to believe that there had been no change of such relationship, and that Manley was still the owner of the farm in question; and for this reason the Strickland Company furnished Manley the supplies and took the mortgage as security for the debt. Both Manley and Strickland testified that the Strickland Company had no notice of the contract of May 20, 1920.

In response to the rule the sheriff filed an answer setting out the various executions in his hands claiming the fund arising from the sale of the crops of J. M. Manley, made on the Underwood farm. Upon the trial of the case the judge formulated and submitted to the jury the issues of fact applicable to each claim, in the form of questions which the jury by its verdict were to answer. These questions and the answers were as follows: First. Was the bond for title held by J. M. Manley from F. K. Underwood cancelled in March, 1920, by the consent of both parties? (Answer yes or no.) The jury answered: " Yes." Second. Did J. M. Manley agree with F. K. Underwood, about

September 1st, 1920, that he could not make the payment and would pay rent? (Answer yes or no.) Answer: "Yes." Third. Did the R. F. Strickland Company furnish any money or supplies to J. M. Manley from January, 1920, to May 20th, 1920, before the signing of the contract of May 20th, and aid him in making the crops, (Answer yes or no.) And if so, how much? Answer: "No." Fourth. Did Underwood furnish fertilizers to Manley as landlord? (Answer yes or no.) Answer: "Yes."

Based on this verdict the judge formulated a judgment by which he approved of the answers and made them the judgment of the court, and directed that out of the fund in question the sheriff pay, upon the lien of F. K. Underwood for rent for the year 1920, $1,080, and, on his lien for supplies for 1920, $2,722.93; making the total to be paid.to Underwood $3,802.93; and that other small items not involved in this case be paid, and rendered judgment against A. R. Manley upon his claim of a special laborer's lien on the proceeds in the hands of the sheriff. J. M. Manley, the R. F. Strickland Company, and A. R. Manley filed each a motion for a new trial, containing in substance the same assignments of error; the motions were overruled, and all of the cases were argued together in this court, and may be fully covered by one decision.

*M. Z. O'Neal, R. A. McGraw, Terrell & Foley, McLaughlin & Jones, H. H. Revill,* for plaintiffs in error.

*Hatchett & Hatchett, Hall & Jones,* contra.

HILL, J. (After stating the foregoing facts.) The controlling question of law, under the facts of this case, is, what was the relationship between Underwood, the plaintiff, and Manley, the defendant? Was that relationship one of landlord and tenant, or of vendor and vendee? If the evidence shows that at the time the fertilizers were furnished by Underwood to Manley, Underwood occupied the relationship of landlord to Manley, it follows, as a matter of statutory law, that Underwood had a landlord's lien for rent and a lien for the supplies furnished to make the crop for the year when his distress warrant for the rent was issued and his lien for supplies was foreclosed, and that a verdict in his favor resulted. If at that time Underwood occupied the relationship of a vendor and the defendant of vendee, the ver-

dict in this case is contrary to law and should be set aside. Incidental to the question as to the relationship between the plaintiff and the defendant another question arises, to wit: Were the supplies furnished by the plaintiff to the defendant while the plaintiff occupied the relationship of landlord to Manley, or while they occupied the relationship of vendor and vendee? The learned trial judge submitted these two questions to the jury, presenting, in his instructions to the jury as to these two questions, a most illuminating statement of the law applicable to the evidence as the jury might find the facts to be. The jury found, in answer to the first question, that the bond for title held by J. M. Manley from F. K. Underwood was cancelled in March, 1920, by both parties. The evidence as to this fact was in direct conflict. The plaintiff swore positively that the bond for title was cancelled in writing by the consent of Manley, the defendant, in March, 1920. The defendant, on the contrary, swore positively that the bond for title had never been cancelled and that the executory contract of sale was still in force. The jury had the right to accept the testimony of the plaintiff on this point.

The evidence shows that after this cancellation was made, as claimed by Underwood, Manley remained in possession of the property as Underwood's tenant, and that while this relationship existed Underwood furnished to Manley, as tenant, fertilizers to make a crop for that year on the land which he had previously agreed to sell but which was then occupied by Manley as a tenant. And the jury, in answer to the question submitted by the court, " Did Underwood furnish fertilizers to Manley as landlord? " answered in the affirmative. The jury, therefore, having passed upon both these questions in favor of the contention of the plaintiff that he was a landlord when the supplies were furnished and the distress warrant for rent issued, and these answers being supported by evidence, it follows that the verdict in favor of Underwood, giving him priority in the distribution of the funds arising from the sale of the crops made on the land in question was right in law and should be allowed to stand, unless there appears to have been some prejudicial error committed by the judge in the trial of the case, either in his rulings on testimony, or in his charge to the jury, or his refusal to charge.

Subsequently to the cancellation of the bond for title the re-

lationship between Underwood and Manley of landlord and tenant continued until May 20, 1920, when, according to the testimony of Underwood, at the urgent request of Manley, he gave Manley another chance to pay for the land, and a new contract was entered into between the two, which, in effect, extended the time of payment and provided that if the payment was not made in accordance with the agreement, the relationship of landlord and tenant should continue to exist. This contract was construed by the trial judge as continuing the relationship of landlord and tenant, with the right in the tenant, Manley, to purchase the land in question by paying the purchase-money notes as they became due; and, under this construction, as the undisputed evidence showed that Manley had failed to pay the first of these notes when it became due, the relationship of landlord and tenant continued. To this situation the judge, in his charge, applied the principle of law as announced in the case of *Hodnett* v. *Mann,* 10 *Ga. App.* 666 (73 S. E. 1082), as follows: "Where an owner of land contracts with another to sell it at a stipulated price, to be divided into installments becoming due at specified times, and further stipulates that in the event the installments are not paid when they mature, the owner shall be paid a specified sum as rental for the land, the legal effect of the contract is to create the relation of landlord and tenant between the parties, with an option to the tenant to purchase the land upon the terms and conditions set forth in the contract." And "where, after the execution of such a contract, and before the first installment of the purchase-price becomes due, the parties mutually agree upon a rescission of so much of the contract as relates to a purchase of the land, the owner has a lien upon the crops grown upon the premises described in the contract, both for rent and for supplies furnished by him which were necessary to make the crop." Under this decision, as applied to the facts of this case, the verdict in favor of Underwood, giving him a priority on the funds in the hands of the sheriff, realized from the sale of the crops made on the land in question, which Manley held as tenant under his agreement with Underwood, was a proper verdict.

What we have said thus far applies to the relative rights of Underwood and Manley, and is especially applicable to the general grounds of the motion for a new trial filed by Manley. In

his amendment to the motion for a new trial Manley assigns error on certain special grounds which will be considered seriatim.

First.   Error is assigned as to the ruling of the court in admitting in evidence the testimony of Underwood as follows: " I furnished J. M. Manley guano in 1920, the guano he used on the F. K. Underwood lands and on the Mrs. Underwood and Strozier lands.   This guano was furnished through the Zebulon Gin & Fertilizer Company of Zebulon, Ga., and amounted to the sum of $3,019.45, to be used, and was used, under crops growing on these lands." It was objected that this evidence was inadmissible and immaterial and should not have been admitted; that Manley was, under the evidence, in possession of the land at the time the guano was furnished, as a purchaser holding bond for title from Underwood, and Underwood was not landlord, and, not being landlord, could not furnish the same as landlord; and on the further ground that his evidence as to furnishing the same in such capacity was a conclusion of the witness.   This evidence was admissible.   It bears directly upon the question which is the fundamental question in the case, as to what was the relation between Underwood and Manley when the guano was furnished in 1920.   It was claimed by Underwood that the executory contract of sale made with Manley had been cancelled by mutual consent between him and Manley, and it illustrated the question submitted by the court to the jury, as to what was that relationship between Underwood and Manley after the cancellation of the bond for title; which question was answered by the verdict finding that the relationship was one of landlord and tenant. The testimony was material to this issue, was not a conclusion of the witness, and enabled the jury to determine the very question involved, to wit, the relationship which existed between Underwood and Manley after the cancellation of the bond for title.

Second.   It is insisted in this objection that the court erred in submitting to the jury the following question: "Was the bond for title held by J. M. Manley from F. K. Underwood cancelled in March, 1920, by the consent of both parties?" The jury answered this question in the affirmative.   What we have said on the foregoing assignment of error applies to this assignment also.   The controlling issue in the case was whether the ex-

ecutory contract of sale entered into between Underwood and Manley in August, 1919, remained of force in 1920, or whether the parties thereto had by mutual agreement abrogated it. If this contract remained of force, Manley's possession of the land was as a purchaser, and he would not have been liable for the rent for 1920, nor would Underwood have had a lien on the crops of that year for supplies furnished by him to Manley, but if the contract was abrogated by mutual consent, then Manley would be liable to Underwood as landlord, and Underwood would have a lien for the supplies. This was, as above stated, the controlling issue, and this issue was properly submitted for determination by the jury, and the verdict finding that the bond for title was abrogated in 1920 by the consent of both parties was fully supported by the evidence.

Third. It is insisted that the court erred in charging the jury as follows: "If the bond for title was cancelled by the consent of both parties, that is, F. K. Underwood and J. M. Manley, the legal effect of that cancellation would be, J. M. Manley would become a tenant at will or sufferance. If the bond for title was not cancelled by the consent of both parties, then J. M. Manley remained in possession of the premises under his original bond for title as purchaser. So look to the evidence and see what is the truth of the matter, see if the bond for title was cancelled, see if the cancellation was written on the same; and, if so, was it by the consent of J. M. Manley? Did J. M. Manley know that it was being cancelled, and did he consent to it being done? And determine this question by answering yes or no." As above stated, the jury's answer to this question was "Yes." It is insisted that this charge was error in that it gave an incorrect principle of law, the evidence being that even if the parties sought, by this writing across the bond for title, to avoid it (the movant denying that it was cancelled or voided), it was not cancelled or voided by the attempt, because there had been no rescission of the contract by the attempt to rescind, because under the evidence the parties did not restore each other to the original status; that Manley held to his bond for title and Underwood kept the purchase-money notes for the land, and Manley gave to Underwood, and Underwood kept, the sum of $40 in cash that Manley paid Underwood on the land. In other words, there was

no legal rescission of the executory contract of purchase, because there was no restitution by Underwood. It is not material whether the tenancy of Manley was at will or sufferance, and the only complaint is that the attempted cancellation was not in law a real cancellation notwithstanding that both parties agreed that there was a cancellation. In other words, the right of the parties to make a contract and to mutually agree to abrogate it is denied. The doctrine of restitution, as applicable to rescission of contracts, applies only where one of the parties seeks to rescind the contract without the consent of the other. It has no application to the rescission of a contract by mutual agreement of the parties. Civil Code (1910), §§ 4304, 4306. And the issue submitted by the trial court to the jury was whether there had been a cancellation of the contract of sale by the consent of both parties. Therefore it was immaterial whether any restitution had been made; the only material question being whether or not the executory contract of sale had been cancelled by the consent of both parties.

Fourth. Another assignment of error objected to the following charge: " I charge you, however, that Underwood would have the right to buy goods from some one else, or to furnish them out of his own store or house. If Underwood bought the goods from some other party, and that party delivered them to Manley, if Underwood was the purchaser in the first instance, that would amount to the same thing in law as if he furnished them, and he would have a lien." One of the contentions was that the fertilizer, furnished to Manley to make the crop for 1920, was bought directly by Manley, and that Underwood had been simply his security for the payment. On this point the evidence was in conflict; Manley testified that he had bought the fertilizer from the fertilizer company and that he was the debtor, with Underwood as security on the notes given for the fertilizer. Underwood insisted that he had bought the fertilizers and had furnished them to Manley himself. The fertilizer company, through its agent, testified that the company had sold the fertilizer to Underwood and that the credit for them had been given to Underwood and not Manley. The charge on this question is in harmony with numerous decisions of the Supreme Court. In the case of *Scott* v. *Pound*, 61 *Ga.* 579, it was declared that a

landlord may furnish the fertilizers directly from his own store, or may order them from others on his credit, and have them delivered with or without passing through his hands. "If he is the real purchaser for the tenant, the case is one for a lien, even though the joint and several note of landlord and tenant be given for the price. But if the tenant is the real purchaser in the first instance, not deriving title through the landlord, there is no lien. What the truth of the matter is, in its substance and reality, is a question for the jury." This question was submitted to a decision of the jury and their verdict in favor of Underwood is amply supported by the evidence.

There are several other assignments in the amended motion. We have considered each of them carefully in connection with the record in the case and we are satisfied that they contain no merit. The charge of the court, considered as a whole, in so far as it referred to the relationship, under the evidence, between Underwood and Manley, and to the respective rights of each, was a clear, accurate, and luminous submission of the law applicable to the facts. And the verdict, in so far as it determined the relationship between Underwood and Manley, and the resulting rights respectively of the two, is fully supported.

What we have said applies also to the issue between the R. F. Strickland Company and Underwood. This company foreclosed its mortgage on the crops of Manley for the year 1920 and placed its execution in the hands of the sheriff and claimed the proceeds of the sale of the crops for that year. Learned counsel for the Strickland Company contend that the company had a superior lien to that of Underwood because it furnished the supplies without notice of any change of relationship and on the faith that J. M. Manley was the purchaser of the Underwood land and was his own landlord, and that when the supplies were so furnished they believed they were furnishing them to the owner of the land as a purchaser, and that the vendor and the vendee changed that relationship without any notice to the Strickland Company, and that as the company was an innocent third party this change of relationship did not affect the rights of the company; and in support of this contention they quote from the ruling in *Wilkins* v. *Fulcher*, 9 *Ga. App.* 68 (70 S. E. 691), as follows: "The vendor and the vendee in an executory sale can not, by a new and

distinct contract of rescission, convert their relationship into that of landlord and tenant, so as to affect the intervening rights of third persons." This excerpt is correct, but the remainder of the paragraph from which it is taken is applicable to the facts of this case, to wit: "But where, in the contract as originally made, the rescission is provided for, and it takes place in accordance with the original agreement, third persons can not complain that the effect of the rescission is to impair or diminish special rights which they would have had if the parties had carried out the contract as originally intended, instead of rescinding it, unless the rescinding person has done something which would make it unconscionable for him to exercise the right as against the particular third person whose rights are likely to be affected. In this case the complaining third person voluntarily became the creditor of the conditional vendee after he had full notice of the exact nature of the rights which the landowner had reserved in parting with the possession of his land; indeed, this third person himself had participated in forming the contract between the parties, and is in no position to complain because the landowner, in his capacity as landlord, by virtue of the rescission which ensued, is enforcing a landlord's special lien against the crops raised on the land." The evidence in the present case shows that when the Strickland Company sold the fertilizers to Manley the president of the company had notice that there had been a default as to payment of the first installment of the purchase-price of the land. He testified as follows: "I did read the bond for title, saying the same should be void for non-payment, when I agreed to furnish him, and Manley told me that he had defaulted in the first payment and tried to get me to let him have the first installment. I refused because I did not think the land was worth the price he had agreed to pay, and that I did not think Manley had any equity in the land." It thus appears that the Strickland Company, before it furnished these fertilizers to Manley, was put on notice that the condition had happened which authorized the obligor to cancel the bond, and it also appears that Underwood did not do anything to induce the Strickland Company to furnish Manley. In fact he did not know that the company was furnishing him the fertilizers. The case falls squarely within the rul-

ing announced in *Wilkins* v. *Fulcher,* supra. If the Strickland Company, with full knowledge that Underwood had the right to cancel the bond for title for a failure of the obligee to comply with an express condition therein, and, with no inducement from Underwood, but without his knowledge or consent, took the risk of furnishing Manley on the faith of the bond, then it can blame no one but itself for this commercial venture and hazard.

Without extending this discussion further, it is sufficient to say that a careful examination of the record and of the special assignments of error convinces this court that no material error on the trial was committed, and that the verdict finding in favor of Underwood on his special lien as landlord for rent, and also his special lien as landlord for the supplies furnished for making the crops for the year 1920, during the existence of the relationship of landlord and tenant between Underwood and Manley, and that these liens were prior in dignity, under the statute, to the liens of the Strickland Company and A. R. Manley, was supported by the evidence and the law as given in charge by the learned trial judge. Civil Code (1910), §§ 3341, 3348 (6). The judgment refusing to grant a new trial to either of the movants should therefore be affirmed.

In view of this conclusion, the cross-bills of exceptions filed by Underwood, objecting to the rulings of the trial judge as to the admissibility of certain evidence in the case of Underwood against Manley, and the intervention of the Strickland Company, need not be considered, and the cross-bills will be dismissed.

*Judgments on the main bills of exceptions affirmed; cross-bills dismissed. Jenkins, P. J., and Stephens, J., concur.*